**ATLAS READY–MIX OF MINOT, INC., a corporation, Plaintiff and Appellee,**

v.

**WHITE PROPERTIES, INC., a corporation, Steve D. McCormick, Thomas D. McCormick, and Minot Paving Co., Inc., a corporation, Defendants and Appellants.**

**Civ. No. 9879.**

Supreme Court of North Dakota.

May 29, 1981.

McGee, Hankla, Backes & Wheeler, Minot, for plaintiff and appellee; argued by Walfrid B. Hankla, Minot.

Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, for defendants and appellants; argued by Maurice G. McCormick, Fargo.

SAND, Justice.

The defendants, White Properties, Inc. [White], Minot Paving Company, Inc. [Minot Paving], and Steve D. and Thomas D. McCormick [the McCormicks] appealed from a judgment awarding the plaintiff, Atlas Ready-Mix of Minot, Inc. [Atlas], damages from Minot Paving in the sum of $44,666.37, plus costs, and enjoining all the defendants from engaging in the sand and gravel retail business in Ward County, North Dakota, for a period of five years from 9 April 1976. The defendants were also enjoined from purchasing washed material, asphalt aggregate or concrete aggregate from any party other than Atlas and from using their own washed material, asphalt aggregate or concrete aggregate for their own projects for the same period.

Sometime in 1975 or 1976, White purchased the outstanding capital stock of Minot Sand and Gravel. Minot Sand and Gravel had previously conducted the following three separate divisions of the construction business: a sand and gravel business, a ready-mix business, and a paving business. The Minot Sand and Gravel stock was liquidated by White and its assets were transferred to White. The record reflects that prior to the purchase of the stock by White, Atlas was also considering purchasing all three divisions of Minot Sand and Gravel.

On 9 April 1976, Atlas and White executed a sales agreement whereby White sold Atlas equipment for both the sand and gravel business and the ready-mix business plus real property consisting of gravel deposits. The McCormicks personally guaranteed White's performance of the sales agreement between White and Atlas.

White sold Minot Paving the equipment for the paving business plus real property consisting of gravel deposits on the same day. Since 9 April 1976 Minot Paving has dealt with Atlas in Ward County, under the terms of the sales agreement as an assign of White, and counsel stipulated at trial that Minot Paving was bound by the terms and conditions of the sales agreement between Atlas and White.

The sales agreement contained the following language pertinent to this appeal:

". . . [Atlas] as an additional consideration for the purchase of the property described herein agrees to sell washed material or concrete aggregate to . . . [Minot Paving] or their assigns at a 5% greater discount than that allowed to any other persons. If . . . [Minot Paving] or their assigns produce the material themselves then they shall purchase material at the following rates: for all material produced by . . . [Minot Paving] on the property described in subparagraph 1 . . . [Minot Paving] shall pay 15¢ per ton for all material removed; for all material produced by . . . [Minot Paving] on the property described in subparagraphs 2, 3 and 4 they shall pay to . . . [Atlas] the sum of 30¢ per ton for all material removed; for material produced by . . . [Minot Paving] on the property described in subparagraph 5 they shall pay to . . . [Atlas] the sum of 10¢ per ton for all material removed. The above prices for material produced by . . . [Minot Paving] shall not apply to materials in excess of that used by . . . [Minot Paving] in the Minot paving operation. All materials which are purchased by . . . [Minot Paving] in the Minot area shall be purchased from . . . [Atlas] as specified in this paragraph. As additional compensation for the agreement of . . . [Minot Paving] to purchase this material, . . . [Atlas] agrees not to compete in the asphalt paving business in Ward County, North Dakota, for a period of five (5) years.

. . . . .

". . . [Minot Paving] hereby covenants that he will not compete in the concrete

ready mix business or the sand and gravel retail business in Ward County, North Dakota for a period of five (5) years with ... [Atlas]."

A separate agreement not to compete [noncompetition agreement] was also executed on the same day whereby White and the McCormicks agreed not to participate in any business which engaged in the concrete ready-mix business or sand and gravel retail business, and Atlas and its president, Alvin J. Braun, agreed not to participate in any business which engaged in the asphalt paving business.

Atlas initiated this action based on the sales agreement and the separate noncompetition agreement. Its complaint in substance alleged that Minot Paving, as an assign of White, obtained certain materials for construction in the Ward County area from sources other than Atlas and that these actions violated the terms of the previously set out sales agreement. Specifically, Atlas alleged that Minot Paving used gravel from its own gravel deposits for work in the Minot area; that Minot Paving obtained quantities of concrete for use in the Minot area from third parties; that Minot Paving obtained aggregate chips for use in the Minot area from third parties; and that Minot Paving used gravel or aggregate which was not purchased from Atlas for asphalt paving.

The defendants' answer in substance admitted that Minot Paving used some of its own gravel for a construction project; that Minot Paving purchased concrete ready-mix from third parties; and that Minot Paving purchased aggregate chips from third parties. However, the defendants denied that these transactions were a violation of the sales agreement between Atlas and White.

Atlas' complaint also alleged in substance that the defendants sold aggregate base (class V aggregate base) and quality control aggregate (quality control bituminous pavement) to Northern Improvement Co. [Northern Improvement][1] for use by Northern Improvement in Ward County and that the sale of the material was a violation of provisions in the sales agreement and the noncompetition agreement.

The defendants' answer in substance admitted that Minot Paving allowed Northern Improvement to go on land owned by Minot Paving and produce material for a highway project. However, the defendants denied that this action was a violation of the noncompetition portion of the sales agreement or the noncompetition agreement.

After a trial without a jury, the district court entered findings of fact,[2] conclusions of law, order for judgment and judgment in which it determined that Atlas was entitled to damages from Minot Paving in the sum of $6,193.91 for the failure to purchase certain materials under the sales agreement and $38,432.41 for breach of the noncompetition agreement. The defendants were also enjoined from engaging in the sand and gravel retail business in Ward County and from purchasing washed material, asphalt aggregate, or concrete aggregate from any party other than Atlas, or from using its own washed material, asphalt aggregate or concrete aggregate for its own projects for a period of five years from 9 April 1976. The defendants appealed from that judgment.

The first issue raised by the defendants relates to the interpretation of the covenant not to compete. The resolution of this issue requires a determination of whether or not Minot Paving engaged in the "sand and gravel retail business" when they allowed Northern Improvement to go onto gravel deposits owned by Minot Paving and obtain aggregate material (class V aggregate base and quality control bituminous pavement) for a highway project. Northern Improvement did the processing, stripping, and removal of the material from Minot Paving's

---

1. The McCormicks are partial owners of Northern Improvement, but this has no bearing on the merits of our decision.

2. After judgment was entered, the district court entered an order amending the findings of fact. However, those amended findings of fact did not alter the amount of the district court's judgment.

gravel deposit. The trial court found that these actions constituted a breach of the covenant not to compete in the "sand and gravel retail business."

The trial court looked to sales tax legislation (Chapter 57–39.2, NDCC) for a definition of "retail sale" to determine if the described transaction between Northern Improvement and Minot Paving involved the "sand and gravel retail business." Pursuant to § 57–39.2–01(3), NDCC, a retail sale generally means a sale to a consumer or any person for any purpose other than for processing or for resale. There are, however, numerous definitions within the definition. The sale of any tangible property for the purpose of incorporating it into or attaching it to real property is not processing within § 57–39.2–01(3), NDCC, and therefore is a retail sale. *Northern Improvement Co. v. Engen*, 68 N.W.2d 463 (N.D.1954). Based on these definitions the district court determined the transaction whereby Northern Improvement processed the material in the Minot Paving gravel deposit was a retail sale because it did not involve processing within the meaning of § 57–39.2–01(3), NDCC.

Although these definitions may provide some guidance to the resolution of the issue before us, they are not necessarily indicative of the party's intent. An examination of the term "retail sale" as defined in the sales tax legislation and cases interpreting that legislation discloses that it was primarily designed to determine the conditions under which a sales tax is due. As such, the definition encompasses a wide range of sales to insure that revenue will be collected. However, in this instance the determinative factor does not concern the collection of a sales tax but the proper interpretation of the noncompetition agreement. Accordingly, we conclude the district court improperly relied upon the definition of "retail sale" contained in the sales tax legislation. Although the court erred in relying upon the sales tax definition, we have held that a judgment will not be reversed merely because it rests upon inapplicable reasons if the results are the same

under applicable reasons. *KFGO Radio, Inc. v. Rothe*, 298 N.W.2d 505 (N.D.1980). In any event, we must still consider whether or not the transactions between Northern Improvement and Minot Paving involved the "sand and gravel retail business."

The construction of a written contract to determine its legal effect is always a question of a law for the court to decide. *Hager v. Devils Lake Public School District*, 301 N.W.2d 630 (N.D.1981); *Park View Manor Inc. v. Housing Authority of County of Stutsman*, 300 N.W.2d 218 (N.D.1980). The object of interpreting and construing a contract is to give effect to the mutual intention of the parties. Section 9–07–03, NDCC; *Alm Construction Co. v. Vertin*, 118 N.W.2d 737 (N.D.1962). In accordance with the provisions of Ch. 9–07, NDCC, whenever a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible. Section 9–07–04, NDCC; *Hager, supra*. Section 9–07–09, NDCC, requires that the words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage. *Hager, supra*.

In this instance, the term "sand and gravel retail business" was not defined, explained, or given a special meaning by usage in the sales agreement or the noncompetition agreement. Neither can we say that the word "retail" was used in a technical sense. Consequently, we should and must interpret "retail" in its ordinary and popular sense.

The Second College Edition of Webster's New World Dictionary (1980), defines the term "retail" to mean: "the sale of goods or articles individually or in small quantities directly to the consumer." In contrast, that same source defines the term "wholesale" to mean: "the selling of goods in relatively large quantities and usually at lower prices than at retail; esp., such selling to retailers for resale to consumers." Based upon the

above definition and interpretation, we conclude that Minot Paving violated its noncompetition agreement with Atlas.

The defendants construed the above definition of "retail" differently and contended the transaction between Minot Paving and Northern Improvement was a lease royalty agreement and was not a sale of goods or articles. Ergo, the defendants assert they did not compete with Atlas in the "sand and gravel retail business."

However, the record does not support the defendant's contention that there was a lease arrangement. No lease was introduced into evidence, nor does the testimony concerning the transaction reflect such an arrangement. Richard Rutten, the manager of Minot Paving, testified that he characterized the transactions as a sale of materials in the gravel deposit. The transaction may not have been a sale of *goods* as contemplated by the Uniform Commercial Code, see § 41–02–07(1), NDCC; however, we believe the transaction was in reality a *sale* of materials in Minot Paving's gravel deposit, even though Northern Improvement severed the materials from the gravel deposit.

Based on a comparison of the definitions of wholesale and retail, the resolution of the issue before us hinges on whether or not the materials in Minot Paving's gravel deposits were sold to Northern Improvement for resale or for their own use.

Northern Improvement did not resell the raw materials they extracted from Minot Paving's gravel deposit. Instead, Northern Improvement processed the materials into various aggregate materials for their own use on a state highway project. As such, Northern Improvement was the consumer of the materials.

Based on the ordinary use of the word "retail," we believe that because Northern Improvement purchased the materials in Minot Paving's gravel deposits for their own use rather than for resale, the transaction involved the "sand and gravel retail

business." Accordingly, we conclude that the transaction violated the noncompetition agreement.

The next issue raised by the defendants relates to the damages incurred by Atlas as a result of the violation of the noncompetition agreement. The district court determined that Minot Paving sold Northern Improvement 10,535.4 tons of class V aggregate base and 28,317.98 tons of quality control bituminous pavement. The per-ton cost of production for these two materials was 41.49 cents per ton. Atlas submitted a bid to supply both of these materials to Northern Improvement. The price quoted in the bid was $1.15 a ton for the class V aggregate base and $1.50 a ton for the quality control bituminous pavement. Based on those costs and the prices quoted, the district court computed the lost profits for Atlas to be $38,472.41.[3]

The defendants assert that Atlas has not proven that Northern Improvement would have bought the class V aggregate base and the quality control bituminous pavement from Atlas if Northern Improvement had not obtained the material from Minot Paving's land. The defendants point out that Northern Improvement had several options available for obtaining the material for their highway project, including access to two State Highway Department gravel pits and another supplier.

The measure of damages resulting from the wrongful breach of an agreement not to compete is the loss naturally resulting from the breach, including lost profits. *Orkin Exterminating Co., Inc. (Ardwell Division) v. Burnett,* 160 N.W.2d 427 (Iowa 1968). Damages do not flow from the breach of a covenant not to compete as a matter of course, but must be proven. *B & Y Metal Painting, Inc. v. Ball,* 279 N.W.2d 813 (Minn.1979). To establish damages in this instance, Atlas must have established that profits were lost; that the loss was caused by the breach of the covenant not to

---

**3.** The parties did not dispute the figures in computing the cost of production, nor did the parties dispute the method employed in computing the damages regarding the Class V aggregate and the quality control bituminous pavement.

compete; and the amount of the causally related loss is capable of calculation with reasonable certainty rather than speculation. *B & Y Metal, supra; Faust v. Parrott*, 270 N.W.2d 117 (Minn.1978).

In this instance, Atlas introduced sufficient evidence to calculate their lost profits if they had sold all the class V aggregate and the quality control bituminous pavement to Northern Improvement. However, the dispositive question concerns whether or not Northern Improvement would have purchased all the material from Atlas.

■ Initially, we must recognize that a causal connection between the breach of the covenant not to compete and lost profits could rarely be proven with absolute certainty. This is especially true given that there was at least one other supplier in the Minot area, plus two state-owned gravel deposits from which the material could have been purchased. However, we believe the following position adopted by the Minnesota Supreme Court is applicable:

"Because the loss of profits in a complex market can rarely be ascertained with certainty, the plaintiff must often rely on reasonable inferences to establish his loss. Without allowing such inferences, the defendant could purposely breach a covenant not to compete and remain immune from liability. We conclude that once a plaintiff raises a reasonable inference as to the amount of lost profits caused by a defendant's breach of a covenant not to compete, the defendant is liable for such amount unless evidence is presented to rebut the inference and to establish that the loss was caused by factors other than the breach." *B & Y Metal Painting, Inc. v. Ball*, 279 N.W.2d 813, 817.

■ In this instance Northern Improvement received a bid for the class V aggregate base and quality control bituminous pavement from Atlas. Furthermore, Atlas would have been able to supply the material to Northern Improvement. Based on this, we believe the trial court could have drawn a reasonable inference as to lost profits caused by Minot Paving's breach of the

covenant not to compete, and as a result Minot Paving would have had to establish the loss was caused by factors other than the breach. Although other sources existed from which Northern Improvement could have purchased the material, no evidence was introduced that purchases from such sources were a real probability, therefore we believe the record supports the finding that Atlas' lost profits were a result of Minot Paving's breach of the noncompetition agreement.

The last issue raised by the defendants relating to the noncompetition agreement is that the trial court erred in determining that Atlas suffered damages for the class V aggregate base. Minot Paving points out that Northern Improvement offered to purchase the class V aggregate base from Atlas before Northern Improvement processed the material from Minot Paving's gravel deposit. However, Atlas did not sell the class V aggregate base to Northern Improvement because they claimed the bids on the class V aggregate base and the quality control bituminous pavement were "tied" together and that either both of the materials or none of the materials had to be purchased by Northern Improvement. The "tied" bid and the refusal by Atlas to sell Northern Improvement only the class V aggregate base took place before Minot Paving breached the covenant not to compete.

■ The party injured by the breach of a contract must make every reasonable effort to minimize damages and may not recover for damages which could have been avoided by reasonable efforts under the existing circumstances. *Johnson v. Monsanto Co.*, 303 N.W.2d 86 (N.D.1981). In *Nicola v. Meisner*, 84 N.W.2d 702, 706 (N.D.1957), we cited the following from *Shamblen v. Great Lakes Pipe Line Co.*, 158 Neb. 752, 64 N.W.2d 728, 731 (1954):

"The established rule is: 'Where two parties have made a contract, which one of them has broken, the other must make reasonable exertions to render his injury as light as possible; and he cannot recov-

er from the party breaking the contract, damages which would have been avoided, had he performed such duty.' [Citations omitted.]"

These decisions stand for the proposition that the duty to mitigate or minimize damages arises after there has been a breach of contract. However, in the instant case the refusal by Atlas to sell Northern Improvement class V aggregate base occurred before Minot Paving breached the noncompetition agreement, and the defendant did not present evidence how the damages could have been mitigated.

The remaining issues raised by the defendants relate to the portion of the sales agreement whereby Minot Paving agreed to purchase materials from Atlas.

The district court determined the agreement was ambiguous and admitted extrinsic evidence to explain the ambiguity. The district court found the agreement was a "requirements contract" which required Minot Paving to purchase washed materials, concrete aggregate, or asphalt aggregate from Atlas; however, the district court found Minot Paving was not required to purchase concrete ready-mix from Atlas. The district court also found the agreement prohibited the defendants from producing washed material, asphalt aggregate, or concrete aggregate from their own gravel deposits for use on their own projects.

The defendants contend the agreement was neither vague nor ambiguous, and therefore no explanatory parol evidence should have been allowed. Defendants also contend the agreement only requires that if Minot Paving purchases washed material and concrete aggregate, it must purchase those two items from Atlas.

The question of whether or not a contract or the terms of a contract are clear and unambiguous is a question of law. *National Bank of Harvey v. Pauly*, 280 N.W.2d 85 (N.D.1979). When good arguments can be made for either of two contrary positions as to the meaning of a term in a document, an ambiguity exists. *Thiel*

*Industries, Inc. v. Western Fire Insurance Co.*, 289 N.W.2d 786 (N.D.1980). If an ambiguity exists in a contract, parol evidence is admissible to explain existing essential terms or to show the intent of the parties. *National Bank of Harvey v. Pauly, supra; Johnson v. Auran*, 214 N.W.2d 641 (N.D. 1974). However, we must keep in mind that the mutual intent of the parties must be ascertained. Section 9-07-03, NDCC.

Initially, we note that a feasibility study was admitted into evidence through the testimony of Alvin Braun. The study was prepared at Atlas' request by Appraisal Accounts of Minot, North Dakota, to determine the feasibility of Atlas' contemplated purchase of all three of the divisions initially owned by Minot Sand and Gravel (the sand and gravel business, the ready-mix business, and the paving business). Both the McCormicks testified that the feasibility study was not brought to their attention during negotiations for the sale by White to Atlas.

The feasibility study reflected that in order for Atlas' contemplated purchase of the sand and gravel business and ready-mix business to be feasible, Atlas would have to keep the same customers as Minot Sand and Gravel. Minot Paving was one of these customers.

The trial court admitted the study under the business record exception to the hearsay rule.[4] The defendants objected to the introduction of the study because its maker, Darrell Rasmuson, did not testify as to how it was prepared.

In *Tallackson Potato Co., Inc. v. MTK Potato Co.*, 278 N.W.2d 417, 423 (N.D.1979), we quoted the following from *Schuh v. Allery*, 210 N.W.2d 96, 99-100 (N.D.1973):

"We believe that a trial judge, in a nonjury case, should ordinarily admit all evidence which is not clearly inadmissible. A judge who is competent to rule upon the admissibility of evidence can distinguish in his own mind, when deliberating his ultimate decision, between evidence which is admissible and evidence which is

4. See Rule 803(6), North Dakota Rules of Evidence; § 31-08-01, NDCC.

not admissible. The introduction of allegedly inadmissible evidence in a nonjury case will rarely be reversible error, and it may often avoid a possible reversal in cases where this court, on appeal, holds that the evidence is admissible.

"We agree with the statement of the Eighth Circuit Court of Appeals in *Builders Steel Co. v. Commissioner of Internal Rev.*, 8th Cir., 179 F.2d 377, 379:

'In the trial of a nonjury case, it is virtually impossible for a trial judge to commit reversible error by receiving incompetent evidence, whether objected to or not. *An appellate court will not reverse a judgment in a nonjury case because of the admission of incompetent evidence, unless all of the competent evidence is insufficient to support the judgment or unless it affirmatively appears that the incompetent evidence induced the court to make an essential finding which would not otherwise have been made* ... On the other hand, a trial judge who, in the trial of a nonjury case, attempts to make strict rulings on the admissibility of evidence, can easily get his decision reversed by excluding evidence which is objected to, but which, on review, the appellate court believes should have been admitted.' " [Emphasis in original.]

■ We do not believe the trial court erred in initially admitting the evidence because this was a non-jury trial. Although the report was relevant to Atlas' intent, we believe the trial court erred in relying on the feasibility study because it did not reflect the mutual intent of all the parties.

■ The critical sentence of the sales agreement provides that "all materials which are purchased by ... [Minot Paving] to be used in the Minot area shall be purchased from ... [Atlas]." We believe an ambiguity exists as to what the parties intended by the word "materials"; however, we also believe the above-mentioned

phrase required Minot Paving to purchase from Atlas only those materials which Minot Paving did in fact purchase. The words of the sales agreement alone do not prohibit Minot Paving from using materials from its own gravel deposits for its own projects. Rather, the plain words of the sales agreement required only that "all materials which are purchased by ... [Minot Paving] ... shall be purchased from Atlas." Accordingly, we conclude that the trial court erred in determining the sales agreement was a requirements contract and in awarding damages for materials used by Minot Paving from their own gravel deposit and enjoining the defendants from using their own gravel deposits to produce material for their own use.

Damages awarded for the use by Minot Paving of their own materials totaled $5,694.03.[5] Because the trial court erred in determining that Minot Paving was required to purchase these materials from Atlas, the total damage award should be reduced in that amount.

Because we have determined that no requirements contract existed, we need not consider whether or not the subsequent conduct of the parties modified any requirements contract.

Although the paragraph contained in the sales agreement did not prevent Minot Paving from using their own gravel deposit as a source of "materials," we must nevertheless consider what "materials" Minot Paving was obligated to purchase from Atlas if they did purchase any "materials." The resolution of this question requires a determination of what the parties meant by the term "materials."

The district court determined that "materials" included "washed materials," "concrete aggregate," and "asphalt aggregate."

The defendants assert that because only "washed materials" and "concrete aggregate" were specifically mentioned in the sales agreement, the term "materials" includes only those items. The defendants

5. Minot Paving used 75,920.5 tons of material from its own deposits for its own use. Damages on these materials computed at 7½¢ per ton.

also assert that the trial court's determination contravenes the rule of *ejusdem generis.*

The proper interpretation of the term "materials" requires us to consider the previously set-out rules for interpretation. Additionally, we believe the rule of *ejusdem generis* has limited application to this case. That rule provides that where general words (such as "materials") follow particular words (such as "washed materials" or "concrete aggregate"), the general words are construed as being of the same class, kind, or nature as the particular words. *Austin Co. v. United States,* 314 F.2d 518 (Ct.Cl.1963), *cert. denied* 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963); *In re Chadwick's Estate,* 247 Iowa 1050, 78 N.W.2d 31 (1956); see 14 Words and Phrases 191, et seq.

The record reflects that "asphalt aggregate" is a gravel or rock material to be used in making bituminous asphalt (blacktop). "Washed material" is a sand or gravel material that has been washed with water to remove deleterious substances. "Concrete aggregate" refers to high quality rock material used in making portland concrete. These three substances are all gravel or rock material in some form or another and were obtainable from the gravel deposits owned by Atlas. Under the rule of *ejusdem generis,* we believe the general term "materials" refers to materials of the same class, kind, or nature as "washed materials" or "concrete aggregate." This class refers to gravel or rock materials and includes asphalt aggregate as a member.

Furthermore, we also believe the intent of the parties as ascertainable from the sales agreement was that Minot Paving, if it purchased "materials" at all, was to purchase "materials" which could be extracted from the gravel deposits owned by Atlas and which could be used by Minot Paving for their paving operation. Because asphalt aggregate could be extracted from the gravel deposit owned by Atlas and was a necessary material for Minot Paving's asphalt business, we conclude that the term "materials" included "asphalt aggregate" in addition to "washed materials" and "concrete aggregate."

The next issue raised by the defendants relating to the agreement to purchase materials is that the trial court erred in awarding damages in the amount of $282.75 [6] for the concrete aggregate ingredient in concrete ready-mix purchased by Minot Paving from third parties. The concrete aggregate in the concrete ready-mix consisted of "coarse aggregate" and "fine aggregate." Based on the agreement to purchase materials, the defendants assert Atlas was required to give Minot Paving a 5% greater discount than that given to other purchasers of concrete aggregate. The defendants point out Atlas quoted them the same price on the concrete ready-mix as was quoted to other customers. Thus, the defendants assert they were not given a 5% discount on the concrete aggregate ingredients of the concrete ready-mix, and therefore, Atlas could not recover for those damages because they breached the sales agreement.

We do not believe that question is dispositive of the award of damages for the concrete aggregate ingredients of concrete ready-mix. By the terms of the purchase agreement and the district court's findings, Minot Paving was not required to purchase concrete ready-mix from Atlas. However, the award of damages for the concrete aggregate ingredients of the concrete ready-mix indirectly requires Minot Paving to purchase concrete ready-mix from Atlas or else use their own concrete aggregate and mix their own concrete ready-mix. However, Minot Paving was not in the concrete ready-mix business. We do not believe the agreement to purchase materials can sanction indirectly what it did not sanction directly. Accordingly we conclude that the trial court erred in awarding damages

6. There were 3,770 tons of aggregate ingredients used in the concrete ready-mix. Damages of this aggregate was computed at 7½¢ per ton.

in the amount of $282.75 for the concrete aggregate ingredients of concrete ready-mix.

The last issue raised by the defendants is that the trial court erred in not specifically limiting the injunction to the Minot area. All the parties have agreed the injunction should properly be limited to the Minot area. Based on the parties' agreement on this issue, we conclude the injunction should be limited to the Minot area.

In summary, we conclude that there was a breach of the covenant not to compete; that the breach caused damages to Atlas in the amount of $38,472.41; that Minot Paving was required to purchase materials from Atlas only if they did indeed purchase materials, but there was no proscription against Minot Paving using their own materials and thus the award of damages on this question should be reduced by $5,694.03; that Atlas could not recover for the concrete aggregate ingredients of the concrete ready-mix and thus the award of damages should be reduced by $282.75; and that the injunction against Minot Paving should be limited to the Minot area.

Accordingly, we conclude the damage award should be reduced by $5,976.78, and the judgment of the district court, as modified, is affirmed.

ERICKSTAD, C. J., VANDE WALLE and PEDERSON, JJ., and GRAFF, District Judge, concur.

GRAFF, District Judge, sitting in place of PAULSON, J., disqualified.