# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 25-1069

———————————————

Reinhardt Enterprises, LLC

*Plaintiff - Appellant*

v.

Kaseya U.S., LLC; BNG Holdings, LLC, successor BNG Holdings, Inc.

*Defendants - Appellees*

——————————

Appeal from United States District Court
for the District of North Dakota

——————————

Submitted: October 23, 2025
Filed: January 29, 2026

——————————

Before SMITH, KELLY, and GRASZ, Circuit Judges.

——————————

GRASZ, Circuit Judge.

Reinhardt Enterprises, LLC (Reinhardt) alleges that Kaseya U.S., LLC (Kaseya) and BNG Holdings, LLC breached a contract between the parties by refusing to pay Reinhardt a termination buyout fee when Kaseya decided not to renew the contract. The district court dismissed the case with prejudice, reasoning that Kaseya's decision to let the contract expire was not a "termination." Because

"termination" is ambiguous in the context of the parties' contract, we reverse and remand.

## I. Background

In March 2016, Reinhardt and BNG Holdings, Inc., a predecessor to BNG Holdings, LLC, entered a contract in which Reinhardt agreed to market BNG Holdings, Inc.'s services. The contract's "initial term" was "for a period of 3 years," but under section 7.1, it "automatically renewed for additional terms of 1 year each unless either party notif[ied] the other no later than 30 days prior to the end of the current term that it d[id] not wish to renew . . . ." After the contract's initial term ended, the parties allowed it to renew automatically for several years.

In September 2021, BNG Holdings, Inc. was negotiating the sale of its business to Kaseya. Before the sale took place, Reinhardt and BNG Holdings, Inc. amended the contract to replace the then-existing version of section 8.1 with the following:

> 8.1 <u>Compensation to [Reinhardt] Following Termination</u>. If this Agreement is terminated by BNG and such termination is not for (i) a material, uncured default of [Reinhardt] as set forth in Section 7.2, (ii) Other Cause, (iii) [Reinhardt]'s death or (iv) in connection with [Reinhardt]'s Disability, BNG agrees, subject to [Reinhardt]'s timely execution of a reasonable release of claims against BNG and its affiliates, to pay to [Reinhardt] a one-time buy out fee equal to (the "<u>Qualifying Termination Buy-out Fee</u>") (i) thirty-six multiplied by (ii) the then current amount of monthly residual compensation owed to [Reinhardt] at the time of such buy out. If this Agreement is terminated under any other circumstances and [Reinhardt] has a "separation from service" (as defined in Treasury Regulations Section 1.409A-1(h)(2)), BNG shall have no further obligations for payment of any compensation or fees under this Agreement. If payable, the Qualifying Termination Buy-Out Fee shall be paid to [Reinhardt] within thirty (30) days of [Reinhardt]'s execution of a reasonable release of claims referenced above, and in no event later than the date that is two and

one-half (2½) months following the last day of the fiscal year in which such termination occurred.

Two days after the amendment was executed, BNG Holdings, Inc. was converted to BNG Holdings, LLC and sold to Kaseya.

After the sale, Kaseya assumed BNG Holdings, Inc.'s rights and obligations under the contract and continued performing for over two years. However, in January 2024, Kaseya sent a "Non-Renewal" letter notifying Reinhardt "that after careful consideration and evaluation of [its] operational needs, [it] ha[d] decided to discontinue the utilization of [Reinhardt's] services as an Independent Sales Representative . . . in accordance with Clause 7.1 of the [contract]." Kaseya's letter also expressly "remind[ed]" Reinhardt that its "confidentiality and other obligations," "including the non-solicitation of merchants," "continue[d] past the term of [its contract.]"

After sending Reinhardt the non-renewal letter, Kaseya refused to pay the termination buyout fee. As a result, Reinhardt filed this case in state court, alleging Kaseya breached the contract. Kaseya removed the case to federal court and moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court concluded as a matter of law that Kaseya's decision not to renew the contract was not a "termination" and, therefore, Reinhardt is not entitled to the termination buyout fee under section 8.1. Consequently, it granted Kaseya's motion and dismissed the case with prejudice. Reinhardt appeals.

## II. Analysis

We review the district court's interpretation of the contract and its decision to dismiss the case de novo. *See, e.g.*, *Sorenson v. Sorenson*, 64 F.4th 969, 975 (8th Cir. 2023); *Weitz Co. LLC v. MacKenzie House, LLC*, 665 F.3d 970, 975 (8th Cir. 2012). The parties agree that North Dakota law governs this case. Under North Dakota law, "[a] court's primary goal in interpreting a contract is to ascertain" and

give effect to "the intentions of the contracting parties . . . ." *Higgins v. Lund*, 17 N.W.3d 828, 835 (N.D. 2025). In assessing the parties' intent, "we must be guided first by the language of the contract itself, and where the contract is clear and unambiguous there is no reason to go further." *Specialized Contracting, Inc. v. St. Paul Fire & Marine Ins. Co.*, 825 N.W.2d 872, 877 (N.D. 2012) (quoting *Hoge v. Burleigh Cnty. Water Mgmt. Dist.*, 311 N.W.2d 23, 27 (N.D. 1981)). "If, however, an ambiguity exists in the contract, parol evidence is admissible to . . . show the parties' intent." *Bye v. Elvick*, 336 N.W.2d 106, 111 (N.D. 1983). "The terms of a contract are ambiguous when the language is subject to more than one construction or 'when good arguments can be made for either of two contrary positions as to the meaning of a term in a document.'" *Id.* at 111–12 (quoting *Atlas Ready-Mix of Minot, Inc. v. White Props., Inc.*, 306 N.W.2d 212, 220 (N.D. 1981)).

The district court decided Reinhardt is not entitled to the termination buyout fee, reasoning Kaseya's election not to renew the contract was not a termination. The court explained that, in its view, termination and non-renewal are mutually exclusive because a "termination brings an immediate end to the agreement" mid-term, while "in the context of a 'nonrenewal,'" the existing contract is honored "through the expiration of the current term." We are not convinced the parties to the contract unambiguously intended for "termination" and "non-renewal" to have the distinct meanings the district court gave them.

First, the parties did not define "termination" in the contract, so we must give the term its "ordinary and popular" meaning. N.D. Cent. Code § 9-07-09; *see also Hanneman v. Cont'l W. Ins. Co.*, 575 N.W.2d 445, 451 (N.D. 1998) (noting dictionaries are "good source[s] to determine the plain, ordinary definition of an undefined term"). When we do so, the ambiguity in the contract becomes apparent. "Termination" has two different ordinary and popular meanings; while one meaning supports the district court's interpretation, the other favors Reinhardt's. Indeed, "termination" can mean *either* "the act of ending something *or* the end of something." *Termination*, *Cambridge Dictionary* (emphasis added), https://perma.cc/G66M-9KAY; *accord Termination*, *Merriam-Webster*,

https://perma.cc/NJU7-8F3E (defining "termination" as "end in time or existence" or "the act of terminating" or "outcome, result"); *Termination*, *Collins Eng. Dictionary*, https://perma.cc/MC6U-KB2P (defining "termination" as "a terminating or being terminated" or "the end of something in space or time; limit, bound, conclusion, or finish"); *Termination*, *Dictionary.com*, https://perma.cc/6XWA-ZQTB (defining "termination" as "the act of terminating" or "an end or extremity; close or conclusion").

Thus, if termination is given its first ordinary and popular meaning, which comports with the district court's understanding, Reinhardt would not be entitled to the termination buyout fee because Kaseya allowed the contract to expire at the end of its term, rather than affirmatively acting to end the parties' contractual relationship early. But if termination is given its second ordinary and popular meaning, which Reinhardt argues the parties intended, Reinhardt would be entitled to the termination buyout fee because the parties' contractual relationship has ended. Because "termination" is reasonably susceptible to either meaning, the contract is ambiguous, and which meaning the parties intended must be resolved as a question of fact. *See GAP, Inc. v. GK Dev., Inc.*, 843 F.3d 744, 748 (8th Cir. 2016) ("A contract is ambiguous when rational arguments can be made for different positions about its meaning. . . . When a contract is ambiguous, the terms of the contract and the parties' intent become questions of fact." (quoting *Olander v. State Farm Mut. Auto. Ins. Co.*, 317 F.3d 807, 809 (8th Cir. 2003) (en banc))).[1]

Second, when the contract is read in its entirety, there is some evidence supporting Reinhardt's argument that the parties intended for "termination" to mean

---

[1]The district court cited several cases where contracting parties used "termination" in accord with its interpretation. However, we do not find these cases persuasive. Our task is to ascertain how the parties to *this* contract intended for "termination" to be understood, *see Higgins*, 17 N.W.3d at 835, not how other parties have used that term in other contracts. *See Yates v. United States*, 574 U.S. 528, 537 (2015) ("In law as in life, . . . the same words, placed in different contexts, sometimes mean different things.").

the end of their contractual relationship. For example, if we interpret "termination" like the district court and Kaseya, many of the contract's provisions would have no effect in this instance. *See Highline Expl., Inc. v. QEP Energy Co.*, 43 F.4th 813, 817 (8th Cir. 2022) ("We will construe a contract 'as a whole to give effect to each provision if reasonably practicable.'" (quoting *Bice v. Petro-Hunt, L.L.C.*, 768 N.W.2d 496, 500 (N.D. 2009))).

Indeed, according to section 9.15, "[s]ections 2.8, 2.11, 3.4, 4.4, 5.1, and Articles 6, 8, and 9" only "survive termination," not non-renewal. Many of these terms demonstrate the parties decided they wanted to control where, when, and how disputes arising out of the contract would be resolved. For instance, these clauses govern liability for losses, (§§ 2.8, 2.11), the calculation of damages, (§ 6.3), indemnity, (§ 9.2), limits of liability, (§ 9.3), how the contract should be interpreted during litigation, (§§ 9.10, 9.11, 9.13), and the source of law and forum for disputes, (§ 9.14). Other clauses address issues sophisticated entities like the litigants here regularly cover in their contracts, including audit rights, (§ 4.4), representations and warranties, (§ 5.1), non-competition and non-solicitation, (§ 6.1), and confidentiality, non-disclosure, and the ownership of records, (§§ 6.2, 8.3). Given that the parties expended the effort to negotiate and agree to these terms, we think Reinhardt can make "good arguments" they intended the terms would be given effect whenever their contractual relationship ended. *Bye*, 336 N.W.2d at 111.

Moreover, there is also some evidence in the record that Kaseya originally understood these terms would govern if it decided not to renew the contract. For instance, Kaseya argues we should apply the contract's North Dakota choice of law provision, even though it only survives "termination." And while Kaseya conceded at oral argument that Reinhardt cannot be bound by the contract's non-solicitation and confidentiality provisions if Kaseya's interpretation of "termination" prevails, when Kaseya sent Reinhardt its non-renewal letter it expressly "remind[ed]" Reinhardt that its "confidentiality and other obligations," "including the non-solicitation of merchants," "continue past the term of [its contract]," despite these obligations only surviving "termination."

In sum, the district court erred in concluding as a matter of law that Kaseya's decision not to renew the contract was not a "termination." We reach this conclusion because "termination" is reasonably susceptible to the meaning Reinhardt argues the parties intended — i.e., the end of their contractual relationship. Additionally, when the contract is read as a whole, Reinhardt can make "good arguments" that this is the meaning the parties intended because it will give effect to many additional contract terms, as discussed above. *Bye*, 336 N.W.2d at 111. As a result, the contract is ambiguous, and whether the parties intended for Reinhardt to receive the termination buyout fee if Kaseya decided not to renew the contract must be resolved as a question of fact. *See Golden v. SM Energy Co.*, 826 N.W.2d 610, 617 (N.D. 2013) ("Here, the parties have made rational arguments in support of their contrary positions as to the meaning of the language in question. We conclude the contested provisions . . . are ambiguous and the district court erred in interpreting the provisions as a matter of law."); *accord Spagnolia v. Monasky*, 660 N.W.2d 223, 228 (N.D. 2003).[2]

## III. Conclusion

For these reasons, we reverse the district court's judgment and remand for further proceedings consistent with this opinion.

———————————————

---

[2]Reinhardt asks us to decide as a matter of law that it is entitled to the termination buyout fee. But Reinhardt did not ask the district court for this relief, so we decline to do so. We also note that this case is only at the pleading stage. Kaseya may develop additional arguments as to why it is not liable for the termination buyout fee with the aid of discovery.