**B & Y METAL PAINTING, INC., Appellant,**

v.

**Delphus H. BALL, Respondent.**

**No. 48578.**

Supreme Court of Minnesota.

May 11, 1979.

Barnett, Ratelle, Hennessy, Vander Vort, Stasel & Herzog and W. Scott Herzog, Minneapolis, for appellant.

John G. Bell, St. Paul, for respondent.

Heard before OTIS, TODD, and KENNEDY, JJ., and considered and decided by the court en banc.

TODD, Justice.

In 1971, defendant, Delphus H. Ball, sold the assets of his metal painting corporation to plaintiff, B & Y Metal Painting, Inc., and entered into a covenant not to compete. In July 1975, Ball started a competing business in the same building occupied by B & Y. B & Y sought damages. The trial court found that defendant had violated the covenant not to compete, but held that plaintiff had failed to establish any damages. We reverse the trial court on the issue of damages.

Ball was president and principal owner of B & Y Metal Finishing, Inc., which was engaged in the business of painting computer parts and other fabricated metal items in the Twin City area. In October 1971, the assets of B & Y Metal Finishing, Inc., including its goodwill and customer lists, were sold to plaintiff, B & Y Metal Painting, Inc. (hereinafter "B & Y"), for $60,000. As part of this transaction, the parties

agreed that Ball would be employed by B & Y as general manager until January 1972, and thereafter from year to year as mutually agreed.[1] Ball also executed a covenant not to compete with B & Y within a distance of 100 miles from New Brighton, Minnesota, for a period of 3 years from the termination of his employment with B. & Y.[2]

Ball remained as general manager of B & Y until January 1972. He then took an extended vacation, returning to work in the fall of 1972. No new employment contract was signed, but Ball's salary was reduced and his supervisory duties were curtailed. Ball stayed with B & Y until the spring of 1974. In 1975, he reactivated his own corporation, changed its name to Ball Painting, Inc., and in July commenced competitive operations in the same building occupied by B & Y, occupying space on both sides of B & Y.[3] There was evidence that B & Y's customers were occasionally confused by the two operations in the same building, and that Ball added to the confusion by coming onto the premises of B & Y from time to time.

The issues on appeal are:

(1) Did Ball violate the covenant not to compete?

(2) Did B & Y establish any damages under the evidence?

1. Ball argues that the covenant not to compete applied only to the 3 years following his initial term of employment with B & Y, which ended in January 1972. Because the plain language of the covenant does not support this argument, Ball contends that the application of the covenant not to compete to the 3 years following the extension of his employment is invalid as against public policy because it is an unreasonable restraint of trade.

■ Ball's argument is unconvincing. Although the covenant not to compete arose out of both the sale of his business and his employment contract, Ball would have the court test its reasonableness only in terms of the employment relationship. Many of the grounds for imposing a stricter test of reasonableness in the context of an employment relationship, however, are not present here. See, *Bennett v. Storz Broadcasting Co.,* 270 Minn. 525, 535, 134 N.W.2d 892, 899 (1965). In the instant matter, there is no contention that there was unequal bargaining power or oppressive circumstances. On the contrary, Ball's own attorney drafted both the covenant not to compete and the employment agreement. Moreover, Ball was not in the position of the average employee, having nothing to sell but his own labor. He had, in fact, sold his business, including its customer list and goodwill, to B & Y for $60,000, and had signed the covenant not to compete as part of that sale.

Examined as a covenant incident to a sale, and measured by the standards applied by this court in *Bess v. Bothman,* 257 N.W.2d 791 (1977), the covenant in the instant matter is reasonable. Ball's opening of a new competing business the year following the termination of his employment in 1974 was a direct violation of the contract, and the breach was exacerbated by Ball locating his new business in the same building as B & Y, and occupying space on both sides of it.. A more deliberate violation of a noncompetitive covenant is difficult to imagine.

---

1. The employment agreement included the provision: "3. *Term.* Except in the case of earlier termination as hereinafter specifically provided for, the term of this agreement shall be from the date hereof until January 3, 1972. Additional terms of employment will be from year to year and will be by mutual agreement."

2. The covenant not to compete provided: "For a period of three years from the date of the termination of his employment with B & Y METAL PAINTING, INC., Delphus H. Ball, individually, a partnership with others, or in a corporation either existing or to be formed, will not within One Hundred (100) miles of the Village of New Brighton, Ramsey County, Minnesota, directly or indirectly own, manage, operate, jointly control or be employed or participate in ownership, management, operation or control of, or be connected in any manner with any business of the type and character of the business engaged in by B & Y METAL PAINTING, INC. at the time of such termination of employment."

3. Initially Ball, and later Ball's wife, owned the building occupied by B & Y, and rented space to it.

2. The next issue to be addressed is whether and to what extent B & Y sustained damage as a result of Ball's breach. Damages do not flow from the breach of a covenant not to compete as a matter of course. They must be proved. To establish damages, plaintiff must establish by a preponderance of the evidence that (a) profits were lost, (b) the loss was directly caused by the breach of the covenant not to compete, and (c) the amount of such causally related loss is capable of calculation with reasonable certainty rather than benevolent speculation. *Faust v. Parrott,* 270 N.W.2d 117 (Minn.1978).

B & Y argues on appeal that, on the evidence introduced, any of three reasonable methods could have been used to determine the fact and the amount of its damages. First, B & Y showed that its profit margin was 10 to 15 percent of its gross sales, and that its gross sales were as follows:

| | |
|------|----------|
| 1972 | $150,651 |
| 1973 | 283,900 |
| 1974 | 395,926 |
| 1975 | 434,152 |
| 1976 | 396,241 |
| 1977 | 494,262 |

B & Y's average annual rate of growth over these years was 31 percent. Based on this evidence, B & Y argues that damages can be awarded by applying its profit margin to the difference between a 31-percent annual increase in gross sales and its actual increase for each of the years in which Ball violated the covenant. This method of computation would be sound if B & Y had also proved that Ball had caused the decline in its growth rate. There are approximately 12 firms in the Twin City area vying for the available metal painting business on a competitive bid basis. It would have sufficed if B & Y had demonstrated that the metal painting business had, as a whole, continued to grow at a steady rate during the years in question; such evidence would tend to prove that Ball, as opposed to other factors, had caused B & Y's decline. But B & Y failed to introduce any evidence to establish a causal relationship between Ball's breach and its own decline in growth. On the contrary, testimony indicated that the entire industry suffered a decline of 30 to 40 percent in late 1974 and 1975.

Second, evidence was introduced to show that Ball's competing business had made gross sales of approximately $6,000 in July and August 1975; $53,000 from September 1975 through August 1976; and $115,000 from September 1976 through August 1977. Based on this evidence, B & Y contends that its damages can be calculated by applying its profit margin to Ball's gross sales. Although, as a general rule, damages for the breach of a covenant not to compete are to be measured by the plaintiff's loss, not by the defendant's gain, see, generally Annotation, 127 A.L.R. 1152, there are circumstances in which the defendant's gain may be useful in determining the loss sustained by plaintiff. See, *Cherne Industrial, Inc. v. Grounds & Associates, Inc.,* 278 N.W.2d 81 (Minn.1979); *North Pacific Lumber Co. v. Moore,* 275 Or. 359, 551 P.2d 431 (1976). In *Cherne,* we affirmed an award of damages based on the defendants' gain from the violation of a covenant not to compete. In that case, however, the plaintiff's profit margin was only applied to that portion of the defendants' gross income that derived from the plaintiff's former or prospective customers. In contrast, in the instant matter, B & Y did not undertake to prove what percentage of Ball's gross sales were made to B & Y's customers. There are about 10 other competitors in the market, and undoubtedly some of Ball's sales are attributable to business taken from these other competitors.

Third, B & Y argues that it should be awarded as damages that part of the $60,000 purchase price of the business that can be allocated to the purchase of goodwill. We recently rejected this theory of recovery for breach of covenant not to compete in *Faust v. Parrott, supra.* Moreover, the only evidence concerning the value of the goodwill purchased was the testimony of B & Y's president, that $30,000 to $40,000 of the purchase price had been allocated to goodwill. There was no testimony to indicate the actual value of the equipment and inventory sold with the business, thus rendering this estimate of the value of the goodwill entirely speculative.

■ Although none of the theories proposed by B & Y on appeal will support an award of damages, there is other evidence in the record that justifies relief. B & Y demonstrated that its sales to three customers, Ball Brothers, Proto, and VID, decreased markedly after Ball entered competition. Ball admitted that he did business with these customers, who had been included on the original customer list transferred with the business to B & Y, and he offered no evidence to rebut the reasonable inference that B & Y's decline in sales to these three customers was attributable solely to competition in breach of the covenant. By applying plaintiff's profit margin to the amount of decrease in sales to these three customers, the lost profits from these customers can be calculated with reasonable certainty.

Because the loss of profits in a complex market can rarely be ascertained with certainty, the plaintiff must often rely on reasonable inferences to establish. his loss. Without allowing such inferences, the defendant could purposely breach a covenant not to compete and remain immune from liability. We conclude that once a plaintiff raises a reasonable inference as to the amount of lost profits caused by a defendant's breach of a covenant not to compete, the defendant is liable for such amount unless evidence is presented to rebut the inference and to establish that the loss was caused by factors other than the breach.

We reverse the district court's finding that B & Y sustained no damage as a result of Ball's breach, and remand for a determination of damages based on B & Y's loss of profits on sales to Ball Brothers, Proto, and VID, as demonstrated in the record, caused by Ball's breach of the covenant.[4]

Affirmed in part; reversed in part.

---

4. The record discloses that some of the decrease in B & Y's sales to Proto may have been caused by a disagreement between B & Y's president and Proto's president, rather than by Ball's breach. If so, this loss should not be included in computing B & Y's damages.