*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0869**

Gerald J. Hansen,
Appellant,

vs.

N'compass Solutions Inc., et al.,
Respondents.

**Filed April 6, 2015
Affirmed in part, reversed in part, and remanded
Halbrooks, Judge**

Hennepin County District Court
File No. 27-CV-12-20218

Thomas J. Conley, Law Office of Thomas J. Conley, LLC, Minneapolis, Minnesota (for appellant)

Jeffrey W. Thone, Courtney M. Strean, Drew L. McNeill, Stephenson, Sanford, Pierson & Thone, P.L.C., Wayzata, Minnesota (for respondents)

Considered and decided by Halbrooks, Presiding Judge; Johnson, Judge; and Larkin, Judge.

## UNPUBLISHED OPINION

**HALBROOKS**, Judge

In this shareholder dispute, appellant and cross-respondent Gerald Hansen argues that the district court erred by finding that he failed to produce sufficient evidence to support his statutory claim for equitable relief. Respondents and cross-appellants

N'compass Solutions, Inc., Christopher Flaherty, Christopher Pinc, and Kristi Paul assert that the district court erred by finding that they did not prove damages arising out of Hansen's breach of his noncompete agreement and by entering judgment in Hansen's favor for the outstanding balance due to Hansen for the purchase of his shares.

We affirm the district court's determination that Hansen failed to prove his statutory claim and its finding that N'compass did not prove damages from the breach of the noncompete agreement. But we reverse the district court's entry of judgment against N'compass for the outstanding balance due for the purchase of Hansen's shares and remand for entry of an amended judgment that enforces but does not accelerate the terms of the promissory note.

**FACTS**

N'compass is a closely held Minnesota corporation that provides technology services. Hansen co-founded N'compass in 2000 with Flaherty, Pinc, and non-party Keith Meierhofer. In 2012, N'compass had five shareholders: Hansen, Flaherty, Pinc, Paul, and Meierhofer. In addition to being a co-founder, shareholder, and a director, Hansen was also chief executive officer (CEO) from 2009 until May 17, 2012, when his employment was terminated and he was removed from the board. In addition to being shareholders, Pinc was chairman of the board of directors, Paul was a director, and Flaherty was a director and became CEO after Hansen's discharge.

In 2009, Hansen, Flaherty, Pinc, and Meierhofer executed a shareholder agreement. The shareholder agreement expressly stated that N'compass made no

2

commitment to the shareholders' future employment or advancement in the company. The shareholder agreement also contained a noncompete provision:

> [F]or a period of one year after the transfer of his [s]hares, each [s]hareholder shall not . . . directly or indirectly compete with the [c]ompany's business during such one year period in the geographic area where the [c]ompany had conducted its business prior to the transfer . . . .

In 2011, N'compass merged with Kristi Paul's company. Paul became a shareholder and entered into an employment agreement with N'compass. The agreement provided that Paul's employment could be terminated under certain circumstances, after written notice, and following a 90-day cure period. It also provided Paul with a 12-month severance agreement if she was discharged without cause.

Associated Bank was N'compass's lender. As a condition for its line of credit, the bank required that N'compass maintain a minimum tangible net worth. During the time that Hansen was CEO, the bank had become concerned with N'compass's losses of profitability and net worth. In March 2012, Hansen and the chief financial officer (CFO) met with the bank. The bank indicated that its credit department would not agree to a routine extension of the line of credit, given the company's financial situation, but it agreed to a temporary credit extension. The CFO testified at trial that Hansen's aggressive approach had created conflict between the company and the bank.

In 2012, Flaherty, Pinc, and Paul became concerned with the leadership of the company and the situation with the bank. During his testimony at trial, Hansen conceded that morale among N'compass employees had declined due to staff reductions over the previous few years. Hansen also testified that the company lost revenue and business

during his tenure as CEO. But Hansen explained that he did not unilaterally make the staff-reduction and financial decisions; instead, the executive team collectively made those decisions.

On May 8 and 9, 2012, Flaherty, Pinc, and Paul decided to remove Hansen as CEO and terminate his employment. Flaherty, Pinc, and Paul never met with Hansen to discuss their concerns or to give Hansen an opportunity to cure his performance issues. Flaherty, Pinc, and Paul acted under the amended articles of incorporation, which allowed a majority of the board to take action through a signed writing rather than a formal board meeting. On May 17, Pinc told Hansen that his employment was being terminated. Pinc gave Hansen a letter providing five reasons for the termination:

> (1) the continuing deterioration of the revenue and business of N'compass; (2) N'compass covenant defaults and the breakdown and non-renewal of the corporate banking relationship; (3) the declining morale of the employees; (4) the need to decrease expenses and increase the profitability of the [c]ompany; and (5) general loss of trust of a majority of the Board of Directors.

On June 4, Pinc sent Hansen a letter with an offer of a three-month severance package. Hansen did not respond to the offer, and N'compass revoked the offer on June 15, 2012.

While Hansen was CEO, N'compass provided services to GovDelivery, a non-party company. In late 2011 and early 2012, N'compass entered into discussions with GovDelivery to start a large data-center project. In July 2012, two months after his termination from N'compass, Hansen began providing services to GovDelivery on a data-center project. On October 1, 2013, Hansen became a full-time employee of GovDelivery.

4

Pursuant to the shareholder agreement, N'compass initiated purchase of Hansen's shares in the company after his employment was terminated. N'compass initially offered to purchase Hansen's shares at a price of $.09 per share, but Hansen argued that the price was artificially low and unreasonable. Because the parties could not agree on the value of the company or a single appraiser, N'compass followed the procedure prescribed by the shareholder agreement and hired an appraiser to determine the value of the shares. Eventually, Hansen agreed to a purchase price of $.195 per share. Based on this agreement, N'compass provided Hansen with a promissory note for $156,000 to be paid in four annual installments, beginning on September 28, 2013. Instead of making the first $39,000 payment to Hansen, N'compass deposited $22,749.50 into its counsel's trust account.[1] When Hansen did not receive the $39,000 installment from N'compass, Hansen's counsel sent a notice of default on the promissory note via e-mail to N'compass's counsel on October 3, 2013.

Hansen sued N'compass, Flaherty, Pinc, and Paul, alleging violations of Minn. Stat. §§ 302A.251, .751 (2014), and common-law breach of fiduciary duty. N'compass counterclaimed, alleging breach of noncompete obligations, breach of fiduciary duty, and unjust enrichment.

Following a court trial, the district court entered judgment (1) denying Hansen's claim for relief under Minn. Stat. § 302A.751 because he failed to prove that Flaherty, Pinc, and Paul acted in an illegal, fraudulent, or unfairly prejudicial manner, or otherwise

---

[1] The amount of $22,749.50 reflects the $39,000 installment amount minus one-half of the appraisal fee.

breached their fiduciary duties; (2) denying Hansen's claims for COBRA benefits, uncompensated paid time off, and cash surrender value of a life insurance policy; (3) finding that N'compass proved that Hansen violated the noncompete provision in the shareholder agreement but failed to prove lost profits as a result of Hansen's breach; (4) awarding N'compass damages because N'compass proved that Hansen gained improper benefits through company transactions; (5) denying N'compass's unjust-enrichment claim; and (6) ordering N'compass to immediately pay Hansen the full purchase price of his shares, plus interest, less damages suffered by N'compass.

Hansen and N'compass each moved the district court for amended findings pursuant to Minn. R. Civ. P. 52.02. The district court denied both motions. This appeal and cross-appeal follow.

## DECISION

### I.

Hansen argues that the district court erred by determining that he failed to prove that he is entitled to equitable relief under Minn. Stat. § 302A.751. The statute provides that a district court may grant "any equitable relief it deems just and reasonable in the circumstances" if it is established that the directors or those in control of a closely held corporation have acted (1) fraudulently, (2) illegally, (3) in a manner unfairly prejudicial, or (4) in breach of their fiduciary duty to act in an honest, fair, and reasonable manner toward one or more shareholders. Minn. Stat. § 302A.751, subd. 1(b)(2)-(3), 3a. We review a district court's denial of equitable relief for an abuse of discretion. *Bolander v. Bolander*, 703 N.W.2d 529, 553 (Minn. App. 2005), *review dismissed* (Minn. Nov. 15,

6

2005). "A district court abuses its discretion if its decision is against the facts in the record or if its ruling is based on an erroneous view of the law." *State ex rel. Swan Lake Area Wildlife Ass'n v. Nicollet Cnty. Bd. of Cnty. Comm'rs*, 799 N.W.2d 619, 625 (Minn. App. 2011) (citation and quotations omitted). A district court's "findings of fact 'shall not be set aside unless clearly erroneous.'" *Pedro v. Pedro*, 489 N.W.2d 798, 801 (Minn. App. 1992) (quoting Minn. R. Civ. P. 52.01), *review denied* (Minn. Oct. 20, 1992). "Clearly erroneous means manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *Id.* (quotation omitted).

**Fraudulently or Illegally**

Hansen argues that the district court applied the wrong legal standard by requiring Hansen to establish the elements of common-law fraud and actual misrepresentation in order to prevail under his statutory claim. The district court found that Hansen "did not provide sufficient evidence that Defendants acted fraudulently or illegally. [Hansen] did not attempt to establish the 11 common law tort elements for fraud, . . . or suggest that Defendants made misrepresentations to support a claim for statutory fraud under Minn. Stat. § 302A.751."

The legislature has not defined the term "fraudulently" as used in section 302A.751, and we do not find any cases interpreting the use of the word in that section. Hansen has not alleged any facts to support his allegation that N'compass acted fraudulently. In his complaint, Hansen merely alleged that "[i]n his role as a shareholder, [Hansen] has been damaged because the directors have acted fraudulently and illegally." Hansen conceded at trial that during his time as CEO the company suffered from

deteriorating revenue and business, problems with Associated Bank, and declining employee morale. On appeal, he asserts that N'compass's reasons for firing him were untrue because he was not solely responsible for the company's problems. We conclude that the district court's findings are not clearly erroneous and that it did not abuse its discretion when it determined that N'compass did not act fraudulently. Further, the district court did not abuse its discretion when it found that N'compass did not act illegally because Hansen did not assert any facts in support of his claim that N'compass acted illegally.

**Unfairly Prejudicial Manner**

A district court may grant equitable relief to a shareholder in a closely held corporation when the directors or those in control of the corporation have acted in a manner that is unfairly prejudicial toward the shareholder in his capacity as a shareholder or as an employee. Minn. Stat. § 302A.751, subd. 1(b)(3). Unfairly prejudicial conduct is "conduct that frustrates the reasonable expectations of all shareholders." *Gunderson v. Alliance of Computer Prof'ls, Inc.*, 628 N.W.2d 173, 184 (Minn. App. 2001), *review granted* (Minn. July 24, 2001), *and appeal dismissed* (Minn. Aug. 17, 2001). "[W]hether a shareholder's reasonable expectations have been frustrated is essentially a fact issue." *Id.* at 186.

Shareholder-employees of a closely held corporation "commonly have an expectation of continuing employment" and therefore discharge of a shareholder-employee may be grounds for equitable relief. *Id.* at 189. But a shareholder's expectation of continuing employment is not reasonable "when the shareholder-

8

employee's own misconduct or incompetence causes the termination of employment." *Id.* at 192. To determine whether a shareholder's expectations are reasonable, "courts may rely on written or oral agreements among shareholders or between shareholders and the corporation." *Id.* at 185. Written agreements should be honored to the extent they reflect the terms of the parties' bargain. *Id.* at 186; *see also* Minn. Stat. § 302A.751, subd. 3a ("[A]ny written agreements . . . between or among shareholders . . . are presumed to reflect the parties' reasonable expectations."). But written agreements "are not dispositive of shareholder expectations in all circumstances," and shareholder expectations can "arise from understandings that are not expressly stated in the corporation's documents." *Gunderson*, 628 N.W.2d at 186.

Here, the shareholder agreement states, "All Shareholders employed by the Company . . . acknowledge that . . . [n]o commitment has been made by the Company regarding Employee/Shareholders' future employment or advancement in the Company." The agreement also states that "the Shareholders represent and agree that . . . any investment by a Shareholder in the Company shall not create a reasonable expectation of continued employment for purposes of Minnesota Statutes [s]ection 302A.751."

Hansen argues that he had a reasonable expectation of notice and opportunity to cure before being discharged because N'compass had given other shareholders and employees those opportunities. Hansen asserts that one prior shareholder was given five weeks' notice and an opportunity to cure his performance issues before his employment termination became final. Hansen also asserts that Paul's employment agreement created a new standard for employee/shareholder termination and, as a result, he reasonably

9

expected that "he and his fellow employee/shareholders would be entitled to notice, the opportunity to cure, and one year's severance if terminated without cause."

The district court found that the shareholder agreement reflected Hansen's reasonable expectations as a shareholder and that Hansen had "failed to produce sufficient testimony or evidence indicating that his reasonable expectations as a shareholder or employee were violated." The district court found that N'compass did not act in an unfairly prejudicial manner toward Hansen.

The facts in the record support the district court's findings. The circumstances surrounding Hansen's discharge are distinguishable from the circumstances surrounding the discharges of other shareholders and employees. Importantly, none of the other discharged employees was a party to the 2009 shareholder agreement. Specifically regarding the argument of a "new standard" being created by Paul's employment agreement, testimony at trial revealed that Paul negotiated unique contractual rights because of the risks she faced by selling her company to N'compass. Paul testified that she entered into the unique agreement "[b]ecause I wanted to remain with the team of N'compass, I had formed relationships but I hadn't worked with them yet. I needed to be protected." In addition, Pinc testified that he believed that they only had 15 to 30 days to make a decision regarding the future of N'compass due to the company's financial situation, and therefore they could not offer Hansen a "cure" period. The record also demonstrates that, during Hansen's leadership, N'compass lost value, employee morale declined, and the relationship with Associated Bank deteriorated.

10

Based on the terms of the shareholder agreement and the evidence in the record, we conclude that the district court's factual findings are not clearly erroneous. The district court acted within its discretion in determining that N'compass did not act in an unfairly prejudicial manner toward appellant in his capacity as a shareholder or as an employee.

**Fiduciary Duty to Act Honestly, Fairly, and Reasonably**

Hansen argues that the district court erred when it found that Flaherty, Pinc, and Paul did not breach their fiduciary duty to act honestly, fairly, and reasonably. When determining whether to order equitable relief, Minnesota law requires that the district court

> take into consideration the duty which all shareholders in a closely held corporation owe one another to act in an honest, fair, and reasonable manner in the operation of the corporation and the reasonable expectations of all shareholders as they exist at the inception and develop during the course of the shareholders' relationship with the corporation and with each other.

Minn. Stat. § 302A.751, subd. 3a. Caselaw also explains that shareholders in a closely held corporation have "a fiduciary duty to deal openly, honestly and fairly with other shareholders." *Evans v. Blesi*, 345 N.W.2d 775, 779 (Minn. App. 1984), *review denied* (Minn. June 12, 1984). The common-law fiduciary duty between shareholders is frequently defined as a "duty of good faith and fair dealing." *Gunderson*, 628 N.W.2d at 185; *see also Pedro*, 489 N.W.2d at 801 ("In a fiduciary relationship the law imposes upon them highest standards of integrity and good faith in their dealings with each other."). Whether or not a fiduciary duty has been breached is generally a question of

11

fact. *Berreman v. W. Publ'g Co.*, 615 N.W.2d 362, 367 (Minn. App. 2000), *review denied* (Minn. Sept. 26, 2000).

The district court found that the shareholder agreement expressly provides that Hansen's employment could be terminated and his ownership interest involuntarily removed with or without cause, that the shareholder agreement did not entitle Hansen to a severance package, and that his employment could be terminated through a valid written action pursuant to the terms of the amended articles of incorporation. The district court also found that N'compass was not required to provide notice to Hansen before terminating his employment and that the final valuation of Hansen's shares was consistent with the shareholder agreement. Therefore, the district court found that Flaherty, Pinc, and Paul fully complied with their duties under the shareholder agreement, the articles of incorporation, and Minnesota law.

Hansen contends that Flaherty, Pinc, and Paul breached their fiduciary duty to him based on several grounds. The first is their refusal to redeem his shares for a fair value. But the record demonstrates that N'compass followed the valuation procedure as outlined in the shareholder agreement to determine an appropriate purchase price for the shares.

Second, Hansen argues that Flaherty, Pinc, and Paul failed to deal openly with him because they met to discuss terminating his employment without informing him, and after they made the decision, they did not give him an opportunity to discuss the situation or cure his performance issues. But the record demonstrates that Flaherty, Pinc, and Paul acted pursuant to the amended articles of incorporation, which allowed them to take action through a signed writing rather than a formal board meeting, and pursuant to the

shareholder agreement, which expressly stated that N'compass made no commitment to shareholders' future employment.

Third, Hansen argues that Flaherty, Pinc, and Paul attempted to use corporate counsel to execute their plan to terminate his employment. Although they ultimately retained personal counsel as advised by corporate counsel, Hansen asserts that Flaherty, Pinc, and Paul breached their fiduciary duty by using corporate funds to pay for their personal legal representation.

But none of these claims rises to the level of a breach of fiduciary duty, which we typically reserve for more egregious factual circumstances. *E.g., Pedro*, 489 N.W.2d at 801-02 (concluding that a breach of fiduciary duty occurred when appellants (1) hired a private investigator to follow respondent, (2) fabricated accusations of neglect and malfeasance, (3) threatened to fire respondent if he did not "forget about the discrepancies in the financial records," and (4) admitted to acting in an unfairly prejudicial manner); *Evans*, 345 N.W.2d at 779-80 (concluding that appellant breached his fiduciary duty by shouting at respondent, threatening to dissolve the company, and acting in an abrasive and intimidating manner to convince respondent to resign). We therefore conclude that the district court's finding that Flaherty, Pinc, and Paul did not breach their fiduciary duty to Hansen was not clearly erroneous and that the district court did not abuse its discretion by finding that Hansen failed to prove a basis for relief under section 302A.751.

## II.

In its cross-appeal, N'compass argues that the district court erred by finding that it failed to prove damages arising out of Hansen's breach of his noncompete obligations. The district court found that the noncompete covenant in the shareholder agreement was a reasonable restriction and therefore enforceable. The district court also found that Hansen breached the shareholder agreement by competing against N'compass when he began working for GovDelivery. But the district court found that N'compass did not meet its burden to recover damages because N'compass did not sufficiently prove its lost profits as a result of Hansen's breach of the noncompete covenant.

The question of damages is a question of fact. *Pulkrabek v. Johnson*, 418 N.W.2d 514, 516 (Minn. App. 1988), *review denied* (Minn. May 4, 1988). Findings of fact "shall not be set aside unless clearly erroneous." *Cherne Indus., Inc. v. Grounds & Assocs., Inc.*, 278 N.W.2d 81, 88 (Minn. 1979). "In order to overturn a [district] court's findings, this court must be left with a definite and firm conviction that a mistake has been made, notwithstanding the evidence to support such findings." *Id.*

Damages awarded for a breach of a noncompete covenant "are measured by the business loss suffered as a consequence of the breach." *Faust v. Parrott*, 270 N.W.2d 117, 120 (Minn. 1978).

> Damages do not flow from the breach of a covenant not to compete as a matter of course. They must be proved. To establish damages, [the injured party] must establish by a preponderance of the evidence that (a) profits were lost, (b) the loss was directly caused by the breach of the covenant not to compete, and (c) the amount of such causally related

> loss is capable of calculation with reasonable certainty rather than benevolent speculation.

*B & Y Metal Painting, Inc. v. Ball*, 279 N.W.2d 813, 816 (Minn. 1979).

But "there are circumstances in which the defendant's gain may be useful in determining the loss sustained by plaintiff." *Id.* The Minnesota Supreme Court has held that "where an employee wrongfully profits from the use of information obtained from his employer, the measure of damages may be the employee's gain." *Cherne Indus., Inc.*, 278 N.W.2d at 94. Similarly, in *B & Y Metal Painting*, the supreme court concluded that "[b]y applying plaintiff's profit margin to the amount of decrease in sales . . . , the lost profits . . . can be calculated with reasonable certainty." 279 N.W.2d at 817. N'compass contends that this is a circumstance where the district court should have used Hansen's gain to calculate N'compass's damages.

But the district court stated that, unlike in *Cherne Industrial* and *B & Y Metal Painting*, "N'compass's causally related lost profits cannot be calculated to a reasonable degree of certainty without benevolent speculation as to N'compass's profit margin." The district court also noted that "[n]o evidence or testimony regarding N'compass's usual profits or profit margins was provided." And N'compass concedes that it did not offer any evidence showing its standard profit margin.

Caselaw supports the district court's finding that, based on this record, N'compass's lost profits cannot be calculated to a reasonable degree of certainty. In *Faust*, the Minnesota Supreme Court held that the petitioners failed to prove lost profits when they introduced evidence of sales by their competitor but failed to introduce

15

evidence of the "actual profit" the competitor received. 270 N.W.2d at 120-21. Similarly, in *Deutz & Crow Co. v. Anderson*, this court held that the "damages are the difference between what [a company's] profits were and what its profits would have been," and the respondent was "entitled to the benefit of the contract and no more." 354 N.W.2d 482, 489 (Minn. App. 1984). We therefore conclude that the district court did not clearly err by finding that N'compass did not prove damages.

**III.**

N'compass also argues that the district court erred by entering judgment against N'compass for the outstanding balance due to Hansen under a promissory note for the purchase of his shares. N'compass issued the promissory note on September 28, 2012, promising to pay Hansen $156,000 in four installments. The note indicates that each installment would be in the amount of $39,000, plus accrued interest, the first installment would be due on September 28, 2013, and each installment thereafter would be due annually in 2014, 2015, and 2016. The note states:

> If notice of default is given to Maker of (i) any non-payment of any of the above installments of principal or interest . . . and Maker has not made such payment within ten (10) days of such notice's receipt or has not cured such other default within thirty (30) days of such notice's receipt, then Holder of this note may, without prior notice to Maker, elect to declare the unpaid balance of this note, including interest hereon, to be immediately due and payable.

The promissory note does not specify what is required to give "notice," but it incorporates the provisions of the shareholder agreement. And the shareholder agreement requires that

16

> notice . . . shall be in writing and signed by the person giving it and shall be deemed to have been duly given (i) on the date when delivered either personally to the party or an affiliate of the party, or by facsimile, or (ii) on the third day after either party mailed certified mail return receipt requested, first class postage paid or sent by private express carrier . . . to the addresses shown on Schedule 1 or on the records of the Company.

Consequently, certain conditions are required before the payment obligations under the note can be accelerated: (1) default, (2) proper notice of default, (3) receipt of notice, and (4) failure to cure default within the applicable time frame.

On September 27, 2013, counsel for N'compass sent a letter to Hansen's counsel, stating that the company would not be paying him the first installment "because of Hansen's breaches of the shareholder agreement, including, but not limited to his breach of the noncompete provisions and his failure to pay half of the appraisal fee." The letter stated that N'compass deposited $22,749.50 into its counsel's trust account, which represented the first installment of $39,000 less the amount Hansen owed for the valuation of the shares. On October 3, 2013, Hansen's counsel sent a letter by e-mail to N'compass's counsel, stating that he was giving notice of default on the promissory note.

N'compass asserts that the issues of default or acceleration under the promissory note were never raised in Hansen's pleadings, and therefore the district court improperly entered judgment on the promissory note. N'compass concedes that testimony and evidence were submitted regarding nonpayment of the first installment of the promissory note and the amount due under the note during the court trial. But N'compass argues that the issue of whether Hansen is entitled to a legal remedy of acceleration under the terms

17

of the note was not raised. Hansen did not raise acceleration of the promissory note in his complaint,[2] but the promissory note was entered into evidence during the trial and testimony was given regarding the amount due under the note. And it is undisputed that N'compass did not make the first payment. We conclude that the promissory note was properly at issue before the district court.

Next, N'compass argues that the district court did not make sufficient findings to support an acceleration of the promissory note. We agree. District courts are obligated to make specific findings of fact pursuant to Minn. R. Civ. P. 52.01. "Findings are necessary to permit meaningful appellate review; failure to make adequate findings will result in remand." *Nat'l Union Fire Ins. Co. v. Evenson*, 439 N.W.2d 394, 398 (Minn. App. 1989), *review denied* (Minn. July 12, 1989).

The district court concluded that Hansen is "entitled to $156,000, the purchase price for his shares, less any damages due to [N'compass]." The district court found that N'compass is entitled to recover the following from Hansen: one-half share of the appraisal fee; three months of Hansen's car payments; Hansen's expense account overage from 2010-2012; and unauthorized charges on Hansen's vehicle account from 2010-2012. These damages amounted to a total of $23,954.84. We affirm the district court's calculation of damages in favor of N'compass.

But with respect to acceleration of the note, the district court did not make any findings regarding (1) what constituted "default"; (2) what constituted "notice";

---

[2] The first installment under the promissory note was not due until a year after Hansen filed his complaint and one month before the court trial.

(3) whether Hansen provided adequate notice of default to N'compass; (4) whether N'compass received notice of default; and (5) whether N'compass failed to cure the default following receipt of notice. In fact, the district court expressly declined to make a finding of default. In its order denying the parties' motions for posttrial relief, the district court stated, "Without going so far as to say that [N'compass is] in breach of the Note, it is undisputed that [N'compass] withheld from [Hansen] the first installment due under the Note."

Because the district court did not make a finding of N'compass's default or otherwise make sufficient findings necessary to accelerate payment under the shareholder agreement and the promissory note, we reverse the district court's order of acceleration of payment and remand for entry of an amended judgment, in which the installment terms of the promissory note are enforced but not accelerated.

**Affirmed in part, reversed in part, and remanded.**