*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1725
A14-2217**

Alan Klapmeier,
Respondent,

vs.

Cirrus Industries, Inc.,
Appellant,
Cirrus Holding Company, Ltd.,
Defendant.

**Filed September 8, 2015
Reversed; related appeal dismissed
Reyes, Judge
Dissenting, Stauber, Judge**

Hennepin County District Court
File No. 27CV1220846

David F. Herr, Jesse D. Mondry, Maslon L.L.P., Minneapolis, Minnesota; and

Edward P. Sheu, Best & Flanagan, L.L.P., Minneapolis, Minnesota; and

Seth Leventhal, Leventhal P.L.L.C., Minneapolis, Minnesota; and

Christopher L. Rudd, C2 Law Group, P.C., Encino, California (for respondent/cross-appellant Klapmeier)

Aaron D. Van Oort, Bruce Jones, Faegre Baker Daniels, L.L.P., Minneapolis, Minnesota; and

Peter W. Carter, Theresa Bevilacqua, Dorsey & Whitney, L.L.P., Minneapolis, Minnesota (for appellant/cross-respondent Cirrus Industries)

Considered and decided by Reyes, Presiding Judge; Larkin, Judge; and Stauber, Judge.

### UNPUBLISHED OPINION

**REYES**, Judge

In this appeal from a judgment following a jury trial on respondent's breach-of-contract claim, appellant argues that the district court erred by denying its motion for judgment as a matter of law or, alternatively, a new trial because the evidence was insufficient to support the jury's findings on (1) the existence of a breach; (2) causation; (3) the foreseeability of respondent's claimed damages; and (4) the amount of damages. By notice of related appeal, respondent challenges the district court's denial of his request for preverdict interest. Because we agree that the evidence was insufficient to support the jury's finding as to the amount of damages, we reverse and dismiss respondent's related appeal as moot.

### FACTS

Respondent Alan Klapmeier and his brother Dale Klapmeier founded appellant Cirrus Industries, Inc. ("Cirrus"), a Minnesota-based maker of personal aircraft. In December 2008, respondent was removed from his position as CEO of Cirrus. In 2010, respondent and partner Ed Underwood co-founded Kestrel Aircraft, a startup airplane company.

### I.    Non-disparagement clause

On June 3, 2011, respondent and Cirrus entered into a settlement agreement that included a non-disparagement clause. In relevant part, the clause provided that "[t]he

2

Parties mutually agree not to voluntarily make any statement, comment, or communication that would to a reasonable person, constitute disparagement of any of the other Parties or that would be considered to be derogatory or detrimental to the good name or business reputation of the other Parties."

## II.    AOPA interview and alleged breach of clause

On July 4, 2011, Aircraft Owners and Pilots Association (AOPA), a large, well-known organization in the aviation community consisting of people interested in general aviation, conducted an interview with Cirrus's CEO Brent Wouters.  During the interview, Wouters was asked about Cirrus's future plans and about respondent's departure from the company.  Specifically, Wouters was asked whether he would have handled respondent's departure differently.  Wouters answered,

> Actually, no.  I think that . . . it's important to understand when you look at companies or industries like Cirrus that involve . . . a product or a new service early on in their cycle, . . . there are founders that have a unique view of a product and they are . . . very good at developing those products early on.  But the business at that juncture is really a research and development type operation.   It's primarily expense oriented.  The question is can you get the capital to pay people to get the design done.

> But our business has long since moved away from that stage. As you saw from 2002 to 2007, our growth was very rapid and it required an entirely different skill set as a management team . . . .   And those skills were instrumental in our growth throughout 2007. . . .   [O]bviously it's taken a different kind of leadership, someone who understands how to deal with economic downturns and turnarounds in those kinds of circumstances as well as the growth mindset to grow the business internationally . . . and be ready to capitalize on new capital and take the product set to a much broader level.  So we've moved well beyond the place where that original skill

3

set of research and development are applicable to our business. And it's a much more mature business today that has discipline and sophisticated business processes. And that's where we're headed in the future.

The interviewer asked the follow-up question, "As the company expands and grows, is there a place for Alan in its future?" Wouters responded, "I don't think so just because . . . we're well beyond those days where I think his skills set[s] are appropriate." This interview was conducted via the internet and was available to the public on the AOPA's webpage. Cirrus "tweeted" a link to the interview on its Twitter page, which has over 10,000 followers.

### III.    Oshkosh Air Show

Respondent attended the annual Oshkosh Air Show—a large general aviation event—a few weeks after the interview took place. Kestrel was an exhibitor at Oshkosh and respondent hoped to meet with potential investors at the event to raise private equity for Kestrel. Respondent was unsuccessful in raising private-equity funds and believed that it was caused by the interview. At that time, Kestrel's aircraft was still under development and did not have Federal Aviation Administration (FAA) certification to manufacture.

Based on those events, respondent commenced an action in district court for (1) breach of contract (non-disparagement); (2) tortious interference with present and prospective contractual relations; (3) breach of contract (anticipatory breach); (4) breach of contract (confidentiality); and (5) declaratory judgment. On September 17, 2013, appellant filed a motion for summary judgment seeking the dismissal of respondent's

4

claims in their entirety. The district court granted appellant's motion with respect to respondent's claims of anticipatory breach and declaratory relief, but denied it as to the remaining claims. Appellant also filed, inter alia, a motion in limine to exclude respondent's expert witness testimony under Minn. R. Evid. 702 and 703. The motion was denied. By the time the jury trial began in March 2014, respondent only pursued his claim of breach of contract (non-disparagement clause).

## IV.   Jury trial

At trial, respondent argued that Cirrus breached the parties' non-disparagement clause based on the statements made by Wouters during the AOPA interview. Respondent believed that they characterized respondent as not having the mindset to grow a business internationally. According to respondent, these statements were particularly detrimental because the interview occurred just before the Oshkosh Air Show. He stated that dozens of people came up to him at the show and asked about the Wouters interview.

John Gauch, a Cirrus executive, testified in his deposition that there was a "buzz" about the AOPA interview during the 2011 Oshkosh Air Show and that he specifically remembered a person from Flying Magazine, an aviation magazine, inquiring about the interview. Gauch explained that it was a "hot topic," causing a lot of people to "read between the lines" in an attempt to figure out what happened at Cirrus. Respondent admitted that he was never told by any specific potential investor that he or she did not invest in Kestrel because of the interview. Respondent explained that this was because no one ever provided him a specific reason for not investing.

5

Underwood, Kestrel's co-founder and Chief Financing Officer (CFO), also testified at trial. Underwood prepared a financial projection for Kestrel, which was admitted into evidence as Exhibit 5. Underwood testified that he had experience raising private-equity funds and that, prior to Kestrel, he had prepared a "couple dozen" financial projections. Exhibit 5 included Kestrel's projected income for the years 2013 to 2019, with the delivery of aircrafts estimated to begin in 2015. Underwood testified that the projections would have been different if they had raised private-equity funds. Kestrel's goal was to raise $30 million in private equity. At the time of trial in March 2014, Kestrel had raised approximately $25 million in public funding, but still had not raised any money in private equity.

The documents in the financial projection were dated 2012 and 2013. Underwood explained that the financial projection was a "living document" that was originally created as early as 2009 and "went through various iterations from 2009 onward." At trial, Underwood acknowledged that Kestrel did not have any financial projections available that were created in 2011.

## V.    Damages

### A.    Expert testimony

George Bristol, an investment banker and managing director of investment banking firm Janas Associates, testified as respondent's expert witness.[1]  Bristol was retained by respondent to determine why Kestrel was unable to get private-equity funding

---

[1] Appellant had two testifying experts. The district court allowed the testimony of both.

in the summer of 2011 and to figure out damages to respondent's ownership interest in Kestrel based on their inability to get private-equity funding.

With respect to causation, Bristol opined that Kestrel was unable to obtain private funding because of Wouters's comments in the AOPA interview. As to damages based on respondent's lost profits, Bristol's calculation began with the assumption that respondent had raised the private equity as anticipated to determine the value of equity ownership respondent would have acquired in five years. Bristol testified that this was a typical corporate-finance methodology for valuing companies and is one that he uses often. Bristol relied on the figures in Underwood's financial projections from 2012 and 2013 for his calculations. The financial projections estimated that Kestrel would have had profits, also referred to as EBITDA,[2] of approximately $45 million in 2017 and $93 million in 2018. From there, Bristol calculated Kestrel's enterprise value by taking a multiple of the EBITDA number, adding projected cash, and subtracting debt. He concluded that Kestrel would have an enterprise value of $500 million in 2017 and $560 million at the end of 2018.

Next, Bristol applied a discount rate of 20%—a percentage based on various risk factors—to the projected enterprise values to reflect the "present value" of Kestrel's worth.[3] The $500 million value in 2017 was reduced to $240 million and the $560 million value in 2018 was reduced to $216 million. Finally, Bristol determined the value of respondent's individual equity ownership based on his percentage of ownership in

[2] EBITDA stands for earnings before interest, taxes, depreciation, and amortization.
[3] At trial in March of 2014, Bristol testified that he adjusted the amount to determine its present value worth as of "today."

7

Kestrel. He concluded that respondent's equity ownership would have been worth between $38.9 and $43.4 million had he successfully raised private equity.[4]

### B. Out-of-pocket expenses

In addition to respondent's claim for lost profits, respondent also sought to recover out-of-pocket expenses totaling $4,652,738.36. Respondent testified that he advanced a shareholder loan to Kestrel in the amount of $2.3 million and guaranteed a loan in the amount of $1 million. He testified that the $49,670.10 listed under "expense reports" were expenses that he incurred while traveling on behalf of Kestrel. As to an aircraft purchased for $900,000, respondent explained that it was a leased airplane that Kestrel disassembled for a company project and that respondent paid for it after the owner rejected its return. Respondent testified that he was owed $148,500 for airplanes that were leased to Kestrel. Lastly, respondent claimed that he was owed $218,693.70 in "payroll and benefits." The jury returned a verdict awarding respondent $10 million in lost profits and out-of-pocket expenses.

## VI. Post-trial motions

Appellant filed a motion for judgment as a matter of law, a new trial, and remittitur. Respondent filed a motion for an award of preverdict interest. The district court issued an order denying all three of appellant's motions. The district court also denied respondent's motion. This appeal followed.

---

[4] Bristol approximated that respondent's individual equity ownership in Kestrel was 40%. Bristol estimated that it would be 18% at the end of 2018, based on his assumption that "as the new investors come in," Bristol's percentage of ownership would be reduced.

**D E C I S I O N**

Appellant argues that the district court erred in denying its motion for judgment as a matter of law, or alternatively a new trial. "Judgment as a matter of law is appropriate when a jury's verdict has no reasonable support in fact or is contrary to law." *Kidwell v. Sybaritic, Inc.*, 749 N.W.2d 855, 861 (Minn. App. 2008), *aff'd*, 784 N.W.2d 220 (Minn. 2010). "Courts must view the evidence in the light most favorable to the nonmoving party and determine whether the verdict is manifestly against the entire evidence or whether despite the jury's findings of fact the moving party is entitled to judgment as a matter of law." *Longbehn v. Schoenrock*, 727 N.W.2d 153, 159 (Minn. App. 2007) (quotation omitted). In applying this standard, "the court may not weigh the evidence or judge the credibility of the witnesses." *Lamb v. Jordan*, 333 N.W.2d 852, 855 (Minn. 1983). We review de novo a district court's denial of a motion for judgment as a matter of law. *Kidwell*, 749 N.W.2d at 861.

**I.**

"A settlement agreement is a contract." *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 581-82 (Minn. 2010). To prevail on a breach-of-contract claim, the plaintiff must show (1) the formation of a contract, (2) the plaintiff's performance of any conditions precedent to its right to demand performance from defendant, (3) the defendant's breach of contract, and (4) damages caused by the breach. *See Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011). Appellant only challenges the existence of a breach and damages. However, because we conclude that appellant is entitled to judgment as a matter of law on damages, we need not consider the issue of breach.

9

To establish lost-profits damages, respondent was required to prove by a preponderance of the evidence that "(a) profits were lost, (b) the loss was directly caused by [appellant's conduct], and (c) the amount of such causally related loss is capable of calculation with reasonable certainty rather than benevolent speculation." *B & Y Metal Painting, Inc. v. Ball*, 279 N.W.2d 813, 816 (Minn. 1979). Appellant contends that the evidence is insufficient to support the verdict because respondent failed "to prove with reasonable certainty the value Kestrel would have had if the breach had not occurred, and compare it to the value Kestrel had after it occurred." We agree.

A determination of whether damages should be excluded because they are speculative is reserved for the court and not the jury. *See Mississippi & Rum River Boom Co. v. Prince*, 34 Minn. 71, 77, 24 N.W. 344, 346 (1885) (explaining that it is "for the court, and not for the jury, to determine what in any case is the proper rule of damages, and when damages are speculative, so that they should be excluded"). A breach-of-contract claim for lost profits cannot be speculative and must be proved to a reasonable degree of certainty. *Leoni v. Bemis Co., Inc.,* 255 N.W.2d 824, 826 (Minn. 1977). As such, damages that are "speculative, remote, or conjectural are not recoverable." *Id.* While Minnesota recognizes lost-profits damages of new or unestablished businesses, such damages are more difficult to prove. *See Cardinal Consulting Co. v. Circo Resorts, Inc.*, 297 N.W.2d 260, 267 (Minn. 1980). One method, as acknowledged by respondent, is to establish the value before and after a breach to determine the diminution in value of the company.

## A.    Lost-profits damages

Respondent seeks "to recover the diminution in the value of his assets as of the date of the injury" based on Bristol's calculation of the enterprise value of his loss of net worth "both before and after" the "injuries in 2011."  Respondent also argues that Bristol conducted an analysis of enterprise value both with and without private-equity financing.  But those assertions are not supported by any evidence in the record.  To the contrary, on cross-examination, Bristol testified that he did not attempt to value Kestrel as of 2011 or *as of any date that predated the Brent Wouters July 4, 2011 interview*.  Because Kestrel did not have any financial projections from 2011, Bristol performed a calculation based on projections made in 2012 and 2013 to determine Kestrel's value as of the date of trial.  The flaw in this calculation is twofold.  First, Bristol relied solely on Kestrel's financial projections that were created in 2012 and 2013, long after the breach occurred, to determine Kestrel's "pre-breach" enterprise value.  Therefore, Bristol's calculation did not include a "before" valuation of Kestrel that was based on Kestrel's financial projections from *before* the breach occurred.  Second, the "present day value" was determined as of 2013 and 2014, not as of 2011 prior to the breach.  Thus, Bristol's calculation to determine Kestrel's "pre-breach" enterprise value was based on the wrong years.

In addition, Bristol's calculation used a "post-breach" value of zero.  This also is not supported by any evidence in the record.  Bristol testified that he did not calculate the enterprise value of Kestrel to determine what respondent's equity ownership was as of 2014.  Bristol explained that, because respondent did not obtain the private equity as

11

predicted in the financial projections, his equity was worth zero as of 2013. Bristol arrived at this conclusion despite evidence that Kestrel raised over $20 million in public funding and that its intellectual property was valued in excess of $35 million. Bristol does not account for these numbers in his calculations and does not attempt to support his "post-breach" value of zero in any way. The testimony of respondent's own expert does not support the claim that a calculation was done before and after the alleged breach to determine the diminution in value.

Respondent also argues that its damages calculation was reasonable because the valuation method used by Bristol is a standard, widely regarded method. Even if we were to assume that an enterprise valuation method is a reasonable way to calculate damages, that is not the calculation Bristol undertook. While Bristol uses a valuation method to determine Kestrel's "pre-breach" number, the figure that Bristol applies as a "post-breach" number is not based on Kestrel's enterprise value. Instead, it appears to reflect the amount that Kestrel raised in private equity funding—which in this case is zero. Bristol's comparison of Kestrel's "pre-breach" enterprise value to its present day "post-breach" value is tantamount to comparing apples to oranges.

Finally, Bristol's reliance on the assumptions in Underwood's financial projections is also troubling. In looking at the EBITDA set out in Kestrel's financial projections for 2017, Bristol testified, "Now, one might say that's a lot of money for a company with zero revenues by now. . . . And the only reason why you might believe that number is because that's what [respondent] did at Cirrus." However, Bristol only reviewed Cirrus's financial statements from 2003 to 2008—the best five years out of the

30 years that the company had been in business.[5] Bristol testified that he looked at those years to see whether "a company can go from virtually no revenues and no shipments to a lot of revenues and a lot of shipments in a very short period of [time] like five years." Noticeably absent from his consideration, however, is the fact that, in 2002, Cirrus already had $90 million in revenues. When asked, "So you're taking Cirrus growing from $90 million to $365 [million] and then you're . . . saying Kestrel would go from zero to $365 [million] in five years and you're ignoring all of Cirrus's history preceding 2002. Isn't that what you're doing?" Bristol responded, "That's correct."[6]

Respondent argues that proof of a lost-profits claim does not call for "absolute certainty." *See Cardinal Consulting Co.*, 297 N.W.2d at 266 (quotation omitted). In *Cardinal*, a jury awarded damages to plaintiff for lost profits caused by the defendant's breach of contract. *Id.* at 262. The defendant appealed, arguing, inter alia, that the plaintiff did not prove lost profits because it did not produce any evidence of past or future profitability. *Id.* at 266. Instead of establishing a value before and after the breach, plaintiff presented evidence at trial that its principals had extensive experience in the business; that they entered the market early; that the market was fertile; and that the same market and time period was profitable for similar businesses the following year. *Id.*

---

[5] Cirrus was founded in 1984.

[6] It bears mentioning that some of the assumptions in the financial projections that were accepted by Bristol appear to be equally suspect. The financial projections relied on by Bristol estimated that Kestrel would capture 64% of the market after five years. However, Cirrus—the only other general aviation company that Bristol considered in his determination—never exceeded 40% of the market share. Similarly, Kestrel projected that its gross margin would be 51% in 2017, even though Bristol acknowledged that Cirrus's gross margins in its best years did not exceed 30%.

at 268. Based on those facts, the supreme court affirmed the damages award. *Id.* It concluded that a "substitute" to a before-and-after approach was available to support the damages award because the "jury could have reasonably based its decision that [plaintiff] lost profits either on evidence of the skill and expertise of the plaintiff's principals plus the proven existence of a market, or on evidence of profitability of [similar businesses] in the same general geographic area at the same time of year." *Id.* (citations omitted).

Unlike *Cardinal*, no evidence shows that a fertile market existed in the general aviation industry when Kestrel entered into the market. Nor is there evidence that other aircraft companies were profitable in 2011. To the contrary, testimony from Bristol and Underwood acknowledged that there was an economic downturn at the time. Underwood testified, "Remember that we started the company in 2010. The 2008 downturn was still hurting everyone. And so in our discussions, . . . we recognized that . . . everyone had basically clammed up and weren't doing anything." Moreover, the evidence showed that even Cirrus suffered losses from 2008 to 2010, a fact that Bristol testified he was aware of but did not include in his determination. *Cardinal* is inapplicable.

### B. Out-of-pocket losses

Finally, appellant asserts that respondent is not entitled to recover damages for his "out-of-pocket" losses. We agree. "As a general rule, the plaintiff has the burden of proving compensatory damages. Compensatory damages are synonymous with actual damages. The term 'actual damages' means '[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses.'" *Poppler v.*

14

*Wright Hennepin Coop. Elec. Ass'n,* 834 N.W.2d 527, 546 (Minn. App. 2013) (quotation and citations omitted), *aff'd*, 845 N.W.2d 168 (Minn. 2014).

Respondent claimed damages for loans, guarantees, purchases, and payroll expenses that he advanced to Kestrel in the total amount of $4.65 million. However, respondent has failed to identify how those items are actual losses. For example, with respect to the loan to Kestrel, no evidence shows that the loans are in default, or that respondent will not be paid back on the loan. Similarly, no legal authority supports the remaining out-of-pocket expenses claimed by respondent. Indeed, respondent acknowledged at trial that the aircraft he purchased for $900,000 could be considered an asset. For these reasons, respondent's out-of-pocket losses are not proper claims for damages and are not recoverable as a matter of law.

We conclude that respondent's calculation of damages is too speculative to permit recovery because it failed to demonstrate the amount of damages to a reasonable degree of certainty. *See Carpenter v. Nelson*, 257 Minn. 424, 428, 101 N.W.2d 918, 921 (1960) (stating that it is "well established" that damages that are "remote, conjectural, or speculative" may not be recovered); *see also Prince*, 34 Minn. 71, 77, 24 N.W. 344, 346 (stating that it is "for the court, and not for the jury, to determine whether damages are too speculative and should be excluded").[7] Therefore, we reverse the district court's denial of appellant's motion for judgment as a matter of law.

---

[7] Because we determine that appellant is entitled to judgment as a matter of law due to respondent's failure to prove damages to a reasonable degree of certainty, we need not address the other issues raised by appellant.

**II.**

Respondent filed a motion seeking an award of preverdict interest.  The district court denied the motion on the grounds that the damages were unliquidated and that the award was for future damages, both of which are exempted from the statute.  On appeal, respondent argues that he is entitled to preverdict interest pursuant to 2015 Minn. Laws, ch. 30, art. 1, § 12, at 226 (amending Minn. Stat. § 549.09, subd. 1(b) (2014)).  Because we determine above that respondent is not entitled to damages as a matter of law, respondent's related appeal for preverdict interest is dismissed as moot.  *See In re Application of Minnegasco*, 565 N.W.2d 706, 710 (Minn. 1997) (explaining that an issue on appeal is moot when an event occurs that makes an award of effective relief impossible or a decision on the merits unnecessary).

**Reversed; related appeal dismissed.**

**STAUBER**, Judge, dissenting

I respectfully dissent because I believe the evidence supported the jury's verdict that appellant Cirrus disparaged Klapmeier, causing damages to Kestrel, Klapmeier's business. This court accords great deference to a jury's verdict and will not reverse "unless it is manifestly and palpably contrary to the evidence viewed as a whole and in the light most favorable to the verdict." *Renswick v. Wenzel*, 819 N.W.2d 198, 204 (Minn. App. 2012) (quotation omitted), *review denied* (Minn. Oct. 16, 2012); *see Moorhead Econ. Dev. Auth. v. Anda*, 789 N.W.2d 860, 888 (Minn. 2010) (stating that an appellate court will defer to a jury's special-verdict decision and will set it aside "only if it is perverse and palpably contrary to the evidence, or where the evidence is so clear as to leave no room for differences among reasonable persons"); *Raze v. Mueller*, 587 N.W.2d 645, 648 (Minn. 1999) (declining to set aside jury verdict when there was conflicting medical evidence on the plaintiff's injury). On a motion for judgment as a matter of law, "[t]he jury's verdict will not be set aside if it can be sustained on any *reasonable* theory of the evidence." *Longbehn v. Schoenrock*, 727 N.W.2d 153, 159 (Minn. App. 2007) (quotation omitted; emphasis added).

Here, following a nine-day trial, the jury awarded $10 million dollars in damages for Cirrus's breach of the non-disparagement clause of the parties' settlement agreement, and the measure of those damages was in the form of future lost profits to Kestrel. Future damages "are impossible to prove with absolute certainty, [and] the rule is that recovery may be had if future damage is reasonably certain to occur." *Kwapien v. Starr*, 400 N.W.2d 179, 183 (Minn. App. 1987). In a business context, damages are "generally . . .

in the form of lost profits." *Poppler v. Wright Hennepin Coop Elec. Ass'n*, 834 N.W.2d 527, 546 (Minn. App. 2013), *aff'd* 845 N.W.2d 168 (Minn. 2014). Damages for lost profits

> may be recovered where they are shown to be the natural and probable consequences of the act or omission complained of and their amount is shown with a reasonable degree of certainty and exactness. This means that the nature of the business or venture upon which the anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of facts.

*Cardinal Consulting Co. v. Circo Resorts, Inc.,* 297 N.W.2d 260, 266 (Minn. 1980) (quotation omitted). The amount of damages must be proven "to a reasonable certainty," but "[t]he law does not require mathematical precision in proving lost profits." *Hydra-Mac, Inc., v. Onan Corp.*, 450 N.W.2d 913, 921 (Minn. 1990); *see Leoni v. Bemis Co.*, 255 N.W.2d 824, 826 (Minn. 1977) (stating that if loss has been demonstrated, difficulty in proving the amount of damages is not fatal if a reasonable basis exists to satisfy that burden).

Klapmeier offered expert-witness testimony from George Bristol, an investment banker with more than 40 years of experience, including private-equity transactions, who applied a methodology that is typically used to value businesses. Bristol's methodology reached an ultimate value of the Kestrel business by taking a multiple of projected profits, adding projected cash, and subtracting projected debt to yield a projected value, which he discounted to present value. He further considered that Kestrel was a startup company, its product was not yet FAA certified, and investors could decline to invest for various reasons. Applying this methodology, Bristol concluded that respondent lost

D-2

between $38.9 million and $43.4 million because of respondent's inability to obtain private-equity funding due to appellant's breach of the non-disparagement clause. When asked during cross-examination about the probability of Kestrel's success if it had received adequate funding from private-equity sources, Bristol said he was "pretty close" to 100 percent certain that the business would have flourished. The evidence that supported his measure of damages, which included numerous considerations that could affect the value of the business and was far more detailed than a typical lost-profits projection, provided a reasonable factual basis to support the jury's award of damages to Klapmeier. *See Gaspers v. Minneapolis Elec. Steel Castings Co.*, 290 N.W.2d 743, 745 (Minn. 1980) (stating that when trial experts' opinions conflict, the function of the factfinder is to resolve the conflict).

The majority attacks several aspects of Bristol's damages calculation, attempting to dislodge the jury's reliance on his testimony to support its damages award. These quibbles are erroneous under the facts and the law. First, any measure of future damages is predictive and therefore somewhat imprecise, but the law permits this as long as the measure of damages is *reasonable*. *See Kwapien*, 400 N.W.2d at 183. In calculating damages for a startup business, Bristol examined Kestrel and determined the difference between its original value, zero, and its value had its efforts to gain private-equity funding not been thwarted by Cirrus's disparagement. This was a reasonable measure of damages. As to its reasonableness, Bristol stated that he "deal[s] with [financial] projections" that are used to predict whether a business will succeed "on a daily basis" and rejects most because they are not reasonable, but that after making a detailed inquiry

D-3

into the financial projections pertaining to Kestrel, he concluded that "the projections are reasonable." Second, the use of some "post-breach" damages was reasonable because the damages were ongoing. Third, to the degree that some of the financial projections that Bristol applied to Kestrel relied on actual financials from Cirrus, this action was reasonable—Cirrus provided a business model that was quite similar to Kestrel's and was a suitable "comparable." Klapmeier was the "founder and driving force" of Cirrus, and Bristol described Klapmeier's success in taking Cirrus from zero to $360 million in revenues as "phenomenal." Fourth, the jury was equipped to evaluate any weaknesses in Bristol's measure of damages and did so by significantly reducing the $38.9 to $41 million dollar amount Bristol arrived at to $10 million dollars. From the three trial experts, the jury heard a number of theories about the value of Kestrel's damages; the jury was persuaded by Bristol's testimony. Overall, Bristol's measure of damages was reasonable, and he presented a compelling testimony despite a grilling cross-examination.

I would defer to the jury's verdict and affirm.